UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

FILED
AUG 21 2018

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| TERRY R. BALVIN, | |
| Plaintiff, | 4:18-cv-4049-LLP |
| v. | MEMORANDUM OPINION AND ORDER REGARDING MOTION TO VACATE, |
| RAIN AND HAIL, LLC, | Doc. 11, AND MOTION TO CONFIRM ARBITRATION AWARD, Doc. 14 |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This case arises out of Defendant Rain and Hail, LLC's denial of Plaintiff Terry Balvin's claim for crop insurance benefits under Plaintiff's federally reinsured multiple peril crop insurance policy. The matter was arbitrated on December 15, 2017, and the arbitrator ultimately concluded that Defendant's denial of benefits was proper. Now pending before the Court is Plaintiff's Amended Motion to Vacate Arbitration Award, Doc. 11, and Defendant's Motion to Confirm Arbitration Award, Doc. 14. Having reviewed the pleadings, for the reasons below, the Court grants Plaintiff's Motion to Vacate and denies Defendant's Motion to Confirm.

## BACKGROUND

In 2015, Plaintiff purchased the relevant multi-peril crop insurance policy, Policy No. MP-0753754 (the Policy), with revenue protection to cover approximately 2,077 acres of corn and soybeans among seventeen fields located in Bon Homme County, South Dakota. Specifically, the Policy covered 1,130.3 acres of corn at a .75 level. The Policy is reinsured pursuant to the Federal Crop Insurance Act, which is administered by the Federal Crop Insurance Corporation (FCIC). The Policy was issued in accordance with the Federal Crop Insurance Act and is codified in federal regulations at 7 CFR § 457.8. The basic provisions have the full force and effect of federal law. *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947).

In October of 2015, Plaintiff cut about 23 acres of corn for silage. During the October 13 to November 20 interval, there was virtually no precipitation for 34 straight days. On October 19, adjuster Allen Skotvold recorded a moisture content of about 22%. On October 23, there was an inch of rain. During the 34-day stretch between October 13 and November 20, Plaintiff

combined 947 acres of beans in eight days but did not combine any corn, though the corn and bean fields were adjacent to each other. It snowed 12 inches on November 20 and on December 4, 2015, Plaintiff submitted a claim on his remaining corn crop, Claim No. 15-005951, under the Policy based on his assertion that "excess moisture" prevented him from harvesting his corn during the period of coverage due to "significant amount[s] of excess moisture, as well as a severe blizzard and large snowfall late in the season." The deadline for completing the harvest, referred to as the "end of the insurance period" (EOIP), was December 10, 2015. On December 18, Allen Skotvold, an independent adjuster, checked on Plaintiff's "unharvest claim." Skotvold testified to driving around the county mapping Plaintiff's fields when he saw neighboring fields that had "maybe two acres left standing" in places. He testified that though Plaintiff had full fields of corn left standing, there were no other full fields standing in the area. Skotvold did not drive in the fields, but testified that they were "dry enough to do anything you wanted to."

On January 11, 2016, Skotvold had a phone conversation with Plaintiff. Skotvold's notes from the phone conversation assert that Plaintiff "has not attempted to do any more harvesting" and noted the need for an appraisal, though "[s]ome fields may not be accessible due to snow drifts." On January 29, Skotvold returned to do the appraisal. Skotvold found the moisture content of the corn was 14.8% and appraised the net yield at 193.1 bushels per acre. Skotvold, however, did not sign the appraisal because he thought the yield was "possibly" too low and not fairly representative of Plaintiff's claim for determining Actual Production History. Skotvold testified that on January 29 he observed snow here and there, a little bit of snow where shaded, but nothing "you would need to plow through," nothing that would keep Plaintiff from harvesting.

At arbitration, Plaintiff's neighbor Jerome Nedved testified that the topography of his farmland is "real similar" to that of the Plaintiff. Nedved raised and harvested 400 acres of corn in 2015 and testified to harvesting about half of that before the EOIP. He harvested the remaining corn acreage at the end of February and the first part of March. Nedved testified that the ground firmed up for about three days at the end of February and for a couple of days in early March, and the "corn stalks were still standing up pretty good." Snowfall records indicate that from February 9, 2016 through March 15, 2016, there were only three days on which there was measurable snowfall, the highest being 0.7 inches. It was during that 35 day stretch that Nedved was able to finish harvesting his corn.

2

Plaintiff himself combined about 78 acres on February 25-27 in a field called "Doc's 80" and obtained a yield of 61.79 bushels per acre. Plaintiff kept a diary of his daily activities, which he referred to as a "Timeline" and the notes from that time state "Knee deep plus track in field," and "Corn laying flat in both fields." On March 30, adjuster Justin Morrison appraised four of Plaintiff's fields. All the fields appraised out above Plaintiff's guarantee.

Plaintiff's entry to his Timeline on June 17, 2016 states "Rain Storm w/ terrible Hurricane Type Winds out of Northeast—Laid all 2015 corn Flat—Blew the stalks w/roots right out of the ground." Plaintiff's Timeline also documents a meeting on June 20 with a former employee of Defendant, who took pictures for a 2016 prevent-plant claim. According to Plaintiff's notes "He told me today that if he was me—He would Pursue a claim on the 2015 unharvested corn—but he wanted his name left out of it." The former employee of the Defendant, at the time he evaluated Plaintiff's claim, was then an employee of Diversified Crop Insurance Services (DCIS), with whom Plaintiff had filed a claim that he was prevented from planting his 2016 bean crop in a timely manner. That employee, in an Adjuster Special Report made to support Plaintiff's claim with DCIS, stated that he "didn't see where [Plaintiff] would have had an opportunity to get the 2015 crop harvested and planted to the 2016 spring crop." He also noted that Plaintiff's fields "were still wet and the 2015 crop was still standing" on June 21, 2016. The pictures taken that day have since disappeared. The arbitrator, in considering the former employee's report as evidence, noted that the statement was made just a few days after the wind and rain storm, which would account for the fields being wet.

On July 14, 2016, Plaintiff resumed combining the 2015 corn. After completing the investigation of the loss claim, Defendant "withdrew" or "released" the claim as a "non-loss" claim. Plaintiff filed a demand for arbitration, claiming crop insurance indemnity for his loss in the sum of $451,042.00. The arbitration hearing was held on December 15, 2017 and declared closed on January 29, 2018. On February 7, 2018, the arbitrator, Waldine H. Olson, denied Plaintiff's claim for losses on his 2015 corn crop, concluding that 1) "Claimant had windows of opportunity, both during and after the EOIP, to harvest his 2015 corn crop;" 2) "For unexplained reasons, Claimant abandoned his 2015 corn crop by failing to harvest the crop in a timely manner, even though he was allowed the opportunity to continue harvesting after the EOIP;" and 3) "The 2015 corn crop suffered additional loss or deterioration before a majority of the crop was eventually harvested."

## STANDARD OF REVIEW

"This Court's review of an arbitration award is limited and the arbitrator's decision is entitled to 'an extraordinary level of deference.'" *See Hasel v. Kerr Corp.*, Civ. No. 99-1376, 2010 WL 148437 at *3 (D. Minn. 2010) (quoting *Stark v. Sandberg, Phoenix & Von Gontard, PC*, 381 F.3d 793, 798 (8th Cir. 2004). Indeed, the Court's "scope of review of [a]n arbitration award . . . is among the narrowest known to the law." *Bhd. Of Maint. Of Way Employees v. Terminal R.R. Ass'n*, 307 F.3d 737, 739 (8th Cir. 2002).

"It is not enough for [Plaintiff] to show that the [arbitrator] committed an error—or even a serious error." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." *Major League Baseball Players Assn. v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam) (internal quotations omitted). "An arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution" and "arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the parties." *See Stolt-Nielsen S.A.*, 559 U.S. at 682–84.

## ANALYSIS

The Federal Arbitration Act (FAA) provides that a court may vacate an arbitration award under four circumstances:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). Plaintiff argues that the arbitration award in this case should be vacated because the arbitrator 1) committed misconduct in refusing to hear evidence pertinent and material to the controversy; and 2) exceeded his power in interpreting policy and procedure as well as what constitutes good farming practices.

4

## ARBITRATOR MISCONDUCT

Where an arbitrator refuses "to hear evidence pertinent and material to the controversy," an arbitration award may be vacated under 9 U.S.C. § 10(a)(3). "In making evidentiary determinations," however, "an arbitrator need not follow all the niceties observed by the federal courts." *Hasel*, 2010 WL 148437 at *3 (quoting *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (internal quotation marks and citations omitted). "In fact, 'an error that requires the vacation of an award must be one that is not simply an error of law, but which so affects the rights of a party that it may be said that he was deprived of a fair hearing.'" *Id.* (quoting *Grahams Serv., Inc. v. Teamsters Local 975*, 700 F.2d 420, 422 (8th Cir. 1982) (internal quotation marks and citation omitted)).

Plaintiff argues that he was improperly denied the opportunity to effectively cross-examine two of Defendant's witnesses at the arbitration hearing. Justin Morrison testified that he would have been in the field assessing production most of the morning on March 28, 2016. Plaintiff testified that no one was in the field that morning. Plaintiff's counsel sought to impeach Morrison's testimony and corroborate Plaintiff's testimony with scale tickets, which would allegedly corroborate Plaintiff's claim that no one was in the field that morning. Defense counsel objected because the scale tickets had not previously been produced. The arbitrator ruled that the scale tickets could not be offered.

Chris Kluge offered testimony regarding his experience and training, as well as the claim and appraisal process. Plaintiff argues that Kluge had previously given sworn testimony in a similar case during a similar timeframe regarding Defendant's failure to follow the Policy's mandatory adjustment process. Plaintiff wanted to use Kluge's "not entirely consistent" previous testimony to impeach Mr. Kluge as well as to further explore the actions and motives elicited in that prior case. Upon objection by Defendant, Plaintiff was not permitted to further cross examine Mr. Kluge on the matter.

*Hasel* is particularly instructive in that there, as is the case here, no record or transcript of the arbitration hearing was made. Accordingly, the Court is left with the award itself and the affidavits and argument of counsel. For purposes of this motion, however, the burden rests upon Plaintiff to establish a basis to vacate. *See Stark*, 381 F.3d at 802. Even if the evidence was excluded to the extent Plaintiff contends, Plaintiff cannot meet his burden. "Every failure of an arbitrator to receive relevant evidence does not constitute misconduct requiring vacatur of an

arbitrator's award." *Hasel*, 2010 WL 148437 at *4 (quoting *Hoteles Condado Beach v. Union De Tronquistas Local 901*, 763 F.2d 34, 40 (1st Cir. 1985)). "Indeed, in conducting arbitration hearings, "[a]rbitrators must be given discretion to determine whether additional evidence is necessary or would simply prolong the proceedings." *Id.* (quoting *Tempo*, 120 F.3d at 19). Each party had "an adequate opportunity to present its evidence and argument" and it cannot be said that Plaintiff was deprived of a fair hearing. *Id.* (quoting *Hoteles*, 763 F.2d at 39). Therefore, the arbitration award may not be vacated under 9 U.S.C. § 10(a)(3).

## GOOD FARMING PRACTICES

Plaintiff also argues that the arbitration award must be vacated because the arbitrator exceeded his authority by 1) interpreting "good farming practices" and 2) failing to submit disputes of interpretation of policy and procedure, including whether specific policy provisions or procedures were applicable, to the FCIC. In response, Defendant asserts that the arbitration award was not based on policy or procedural interpretation, but rather on several alternative factual determinations by the arbitrator. Defendant characterizes the issue raised by the motion as whether the arbitrator found, as a matter of fact, that Balvin failed to meet his burden of proof that an insured cause of loss was present. In reply, Plaintiff, in effect, argues that he met this burden because the arbitrator, in order to determine an insured cause of loss was present, needed to determine how much revenue was generated from Plaintiff's corn enterprise versus the revenue protection guarantee provided by the insurance policy. Because the arbitrator could not determine the revenue without raising issues of good farming practices and interpretation and applicability of certain policies and procedures, and because the arbitrator must resolve such issues by submitting them to the FCIC, which was not done, Plaintiff argues the arbitration award must be vacated.

The basic provisions of the Policy provide for arbitration in the event of a dispute. "However, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, either [the insured] or [the insurer] must obtain an interpretation from FCIC." Policy § 20(a)(1). Further, the insurer makes decisions regarding what constitutes a good farming practice and if the insured disagrees with the decision, the insured must request a determination of what constitutes a good farming practice

from FCIC. *Id.* at § 20(d)(1). Failure to obtain an FCIC interpretation when it is required will result in the nullification of any agreement or award. *Id.* at § 20(a)(1)(i).

Under the Policy, insurance is provided only to protect against unavoidable, naturally occurring events, including "excess moisture." *Id.* at § 12. Failure to follow recognized good farming practices for the insured crops, however, is not a covered loss under the policy. *Id.* at 12(b). The Risk Management Agency (RMA) of the United States Department of Agriculture's (USDA) Loss Adjustment Manual (LAM) Standards Handbook[1] further provides, "[t]he contract does not cover any loss that is due to the insured's failure to follow recognized good farming practices. LAM § 281(K). Included in its list of more common uninsured causes of loss due to failure to follow recognized good farming practices is "[f]ailure to properly plant, care for, or harvest the insured crop." *Id.* at § 281(K)(4).

"Abandoned" is defined in the Policy as "failure to continue to care for the crop, providing care so insignificant as to provide no benefit to the crop, or failure to harvest in a timely manner, unless an insured cause of loss prevents you from properly caring for or harvesting the crop or causes damage to it to the extent that most producers of the crop on acreage with similar characteristics in the area would not normally further care for or harvest it." "For 'failure to timely harvest' to be considered as abandonment, the crop must be in a condition where harvest would be considered as a good farming practice. A crop damaged to the extent that harvest is not practicable will not be considered as abandoned because the producer fails to harvest the crop." *Id.* at § 194(A)(4).

To vacate an award under 9 U.S.C. § 10(a)(4) on the ground that the arbitrator "exceeded [his] powers," the arbitrator must have "stray[ed] from interpretation and application of the agreement and effectively 'dispense[d] his own brand of industrial justice.'" *Stolt-Nielsen S.A.*, 559 U.S. at 671 (quoting *Garvey*, 532 U.S. at 509). Plaintiff argues that the arbitrator could not conclude that Plaintiff had abandoned his crop for failure to harvest in a timely manner without exceeding his authority by interpreting "good farming practices." In response, Defendant argues that the arbitrator merely made factual determinations required to determine whether or not Plaintiff met all of the conditions for insurability required by the Policy and therefore did not exceed his authority. The Court agrees.

---

[1] The RMA is the federal administering agent of the FCIC. RMA's handbooks are official publications for all levels of insurance provided under the Federal Crop Insurance program. *See* LAM § 1.

7

To determine whether a crop has been abandoned, the arbitrator was required to reach a factual conclusion that an insured cause of loss did not prevent proper care or cause damage to the extent that "most producers of the crop on acreage with similar characteristics would not normally further care for or harvest it." Through witness testimony, it was shown that Plaintiff's corn crop was the only crop left standing in the area and the only excess moisture claim made in the county. Further, Plaintiff's neighbor was able to harvest an adjacent field and Plaintiff himself was able to harvest an adjacent bean field. The Court must defer to the arbitrator in his factual conclusion that this was enough to show Plaintiff could not establish that "most producers of the crop on acreage with similar characteristics would not normally further care for or harvest it." Regarding Plaintiff's argument that determining Plaintiff had abandoned his crop for failure to harvest in a timely manner necessarily requires an interpretation of "good farming practices," included in the Loss Adjustment Manual's list of more common uninsured causes of loss due to failure to follow recognized good farming practices is "[f]ailure to properly plant, care for, or harvest the insured crop." LAM § 281(K)(4). Thus, the arbitrator did not have to interpret "good farming practices" itself to come to his conclusion. Instead, he needed only to apply the factual conclusions made from testimony at the hearing to the Policy and Manual's language.

This finding is further bolstered by the fact that Plaintiff showed no further deterioration or causes of loss when the harvest is completed after the EOIP. When the insured harvests their crops after the end of the insurance period, if the harvested production is less than the appraised production, the appraised production will be used to adjust the loss "unless you can prove that no additional causes of loss or deterioration of the crop occurred after the end of the insurance period." § 15(b)(3)(i). Subsequent damage to the crop is covered only when the insured has made "every reasonable attempt to harvest crop timely and properly." LAM § 177B(2)(b). The insured is "expected to harvest the crop if a window of harvest opportunity arises." *Id.* at § 177B(6). Testimony at the hearing established that surrounding farmers were able to harvest their own crop after the EOIP when the land had dried up in February and March, leading the arbitrator to again make a factual conclusion that Plaintiff himself had a window of opportunity to harvest. Further, Plaintiff's own testimony provided that a June wind storm laid his crop flat, denying Plaintiff the ability to prove that no additional causes of loss occurred. Therefore, the arbitrator did not exceed his authority in making factual determinations regarding failure to harvest during windows of harvest opportunity presented after the EOIP.

## APPRAISED VALUE

When the insured harvests their crop after the end of the insurance period, if the harvested production is less than the appraised production, the appraised production will be used to adjust the loss "unless you can prove that no additional causes of loss or deterioration of the crop occurred after the end of the insurance period." § 15(b)(3)(i). Because Plaintiff could not establish that he made "every reasonable effort" to harvest during "windows of harvest opportunity" and could not show that no additional causes of loss or deterioration occurred after the EOIP, the appraised production of the crop must be used. If the appraised production of the crop exceeded the Policy's guarantee, however, Plaintiff was not entitled to insurance benefits.

Here, Plaintiff argues that the arbitrator exceeded his authority in interpreting that the "appraised value" could be measured by the un-signed appraisal worksheets. In Section K of the Arbitration Award, the arbitrator mentioned that Plaintiff's 2015 corn crop was appraised twice, that those appraisals exceeded his guaranteed production, and "the policy provides that those appraisals must be used to calculate the farmer's claim if he decides not to harvest his acreage. (Basic Provisions ¶ 15(b))." That Basic Provision does indeed provide that the appraised production[2] will be used to adjust the loss, however, according to the Corn Loss Adjustment Standards Handbook (CLASH), a corn appraisal requires both an Appraisal Worksheet, "a form used by an adjuster to enter appraisal information," *and* a Production Worksheet, "a progressive form containing all notices of damage for all preliminary, replant, and final inspections on a unit." *See* LAM Ex. 2 (defining Appraisal Worksheet); CLASH § 37.

"A final inspection must be made in order to document production, acreage, insured and uninsured causes of loss, and all other pertinent entries to determine the amount of indemnity, unless the notice has been withdrawn or cleared." LAM § 176. "Anytime a loss adjustment inspection takes place and the claim is denied by the [insurer], a [Production Worksheet] must be completed with at least the following information: Claim Number; Policy Number; Crop Year; Crop Code; United Number; Type, Class, or Variety; Practice; Stage Code "DC" (means denied claim); Acres or number of trees for tree crops; First Notice of Loss Date; Adjuster's signature; Adjuster's code number; and Adjuster's signature date." *Id.* at § 176K. "For the purpose of this procedure a denied claim is any claim for which the insured believes they should be paid an

---

[2] "Appraised production" is defined as "production from unharvested acreage determined by the [insurer] that reflects potential production of the crop at the time of appraisal." LAM Ex. 2.

9

indemnity, replant payment, or prevented planting payment but results in the [insurer] denying such a claim." *Id.*

Under the Policy if a dispute "*in any way* involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, either [the insured] or [the insurer] must obtain an interpretation from FCIC." Policy § 20(a)(1) (emphasis added). Plaintiff asserts that no Production Worksheet was ever completed and Defendant does not dispute that fact. The loss adjustment procedures clearly call for a Production Worksheet to be completed when an insured files a claim for indemnity and the insurer denies that claim. The Parties do not point to, and the Court cannot find, an applicable procedure for determining appraised value when a Production Worksheet is not done and Appraisal Worksheets are not signed. This is precisely the type of dispute regarding the application of policy and procedure that needed to be submitted to the FCIC for interpretation. Accordingly,

IT IS ORDERED that:

1. Plaintiff's Motion to Vacate Arbitration Award, Doc. 11, is DENIED in part and GRANTED to the extent necessary to determine and apply proper procedure when a Production Worksheet is not done and Appraisal Worksheets are incomplete and

2. Defendant's Motion to Confirm Arbitration Award, Doc.14, is GRANTED in part and DENIED to the extent necessary to determine and apply proper procedure when a Production Worksheet is not done and Appraisal Worksheets are incomplete.

Dated this 21st day of August, 2018.

BY THE COURT:

/s/ Lawrence L. Piersol
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK
BY: Summer Wahufust
Deputy

10